IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 27, 2018 Session

## STATE OF TENNESSEE v. ERSKINE ANDY HUNT, JR.

**Direct Appeal from the Criminal Court for Morgan County
No. 2016-CR-4      Jeffery H. Wicks, Judge**

_____

### No. E2018-00500-CCA-R3-CD
_____

A Morgan County jury convicted the Defendant, Erskine Andy Hunt, Jr., of one count of second degree murder, one count of unlawful possession of a firearm by a convicted felon, one count of attempted unlawful possession of a firearm by a convicted felon, and two counts of reckless endangerment; the Defendant pleaded guilty to an additional count of unlawful possession of a firearm by a convicted felon. The trial court sentenced the Defendant to an effective sentence of thirty-three years of incarceration. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his conviction for second degree murder; (2) the State failed to disclose evidence it planned to introduce at trial; and (3) the trial court erred when it instructed the jury about the mental state required for a conviction of unlawful possession of a firearm by a convicted felon. After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed.**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Brennan M. Wingerter (on appeal) and Jedidiah C. McKeehan (at trial), Knoxville, Tennessee, for the appellant, Erskine Andy Hunt, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Russell Johnson, District Attorney General; Robert C. Edwards and Barry Carrier, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION
I. Facts
A. Trial**

This case arises from the Defendant's shooting and killing the victim, Dolly Meyers, in the home of Violet Callahan while Ms. Callahan's two minor children were present. Based on this conduct, a Morgan County grand jury indicted the Defendant for one count of second degree murder (Count 1), three counts of unlawful possession of a firearm by a convicted felon (Count 2: 12-gauge shotgun, Count 3: 20-gauge shotgun, and Count 4: .22 caliber rifle), and two counts of aggravated child abuse (Counts 5 and 6).

The following evidence was presented at trial: Paul Hargis testified that he worked at the Morgan County Sheriff's Office and responded to the scene of the shooting, which took place inside Ms. Callahan's mobile home. Deputy Hargis entered the residence where he found the victim and the Defendant lying underneath a blanket on the floor of the kitchen. The Defendant was "sobbing." Deputy Hargis began securing the scene. From the Defendant's pants pocket, Deputy Hargis collected some 12-gauge shotgun shells, some .22 caliber rifle ammunition, a pocket knife and cigarettes. The Defendant objected to the introduction of this evidence. He first objected to the chain of custody, then he contended that the evidence log provided to him in discovery did not list with specificity the items being introduced but only listed them as "contents of suspect's pockets." The Defendant then clarified that he was objecting, specifically, to the pocketknife and cigarettes which were not listed in the evidence log. The trial court "reserved entry" of these items of evidence until further foundation could be laid by additional witnesses; the Defendant "reserved" his objection that the State was attempting to introduce evidence not listed in the evidence log, specifically the pocket knife and cigarettes.

Deputy Hargis found a "pump 12-gauge" camouflage shotgun on the floor of the residence. Another deputy checked the victim's body for vital signs and found none. During a search of the residence, the deputies found spent .22 caliber shell casings in a bedroom. The residence's occupants, including some children, were hiding in a bedroom and were escorted out.

On cross-examination, Deputy Hargis agreed that he spoke to the Defendant at the scene. The Defendant told him that "some drug dealers" had come to the residence "to get him." He told Deputy Hargis that the drug dealers came back later and tried to get inside the residence causing the Defendant to shoot through the door, during which he accidentally shot the victim with a 12-gauge shotgun. Deputy Hargis was shown the evidence log but stated that he had not prepared it.

Mike Wren testified that he worked at the Morgan County Sheriff's Office as an investigator and that he responded to the scene of the shooting at approximately 8:00 a.m. Investigator Wren processed and logged the evidence found at the scene. He collected

2

two spent .22 caliber shell casings. He also collected a 12-gauge shotgun, a semi-automatic .22 caliber rifle, and a third weapon, later identified as the 20-gauge shotgun. Investigator Wren clarified that some or all of the weapons were inside a police vehicle, for safety reasons, when he arrived. Investigator Wren identified a photograph of the door of residence with bullet holes on the inside of the door.

Investigator Wren identified a bag of evidence, which he described as the "contents of the [Defendant's] pockets." He testified that all of the items from the Defendant's pockets were placed in an evidence bag together and that no items had been removed. The Defendant again objected to the introduction of this evidence

Investigator Wren interviewed the Defendant, who stated that he and the victim had been at the Defendant's mother's house earlier that evening when his mother asked them to leave. They went to Ms. Callahan's house, who agreed to let them spend the night at her house. The Defendant said that, at some point during the night, "he felt threatened" because of some phone calls he had received. When the Defendant awoke the next morning, he "went to the front door, moved the curtain, looked out the front door, turned around, saw movement at the back door and pulled the trigger." The Defendant was distressed during the interview with Investigator Wren. He admitted to Investigator Wren that he was under the influence of methamphetamine at the time of the interview, and Investigator Wren recalled that the Defendant was having trouble breathing, consistent with methamphetamine use.

On cross-examination, Investigator Wren testified that he only logged evidence that he believed relevant to the case. As such, of the items collected from the Defendant's pocket, he did not log the cigarettes or pocket knife. About the various types of ammunition or ammunition shells that he collected from the residence, Investigator Wren stated that he chose to count the number of some types of ammunition and not others. He testified that he had interviewed Ms. Callahan and that she initially said she did not witness the shooting. She later admitted to having seen the shooting.

Violet Callahan testified that, at the time of the incident, she lived across the street from the Defendant's mother with her boyfriend and her two children. On the night of the shooting, Ms. Callahan was home with her children, a sixteen-year-old daughter and a three-year-old son. Around 9 p.m., the victim knocked on her door with the Defendant and another individual, Brandon Frost. The group told Ms. Callahan that they needed a place to stay because they had been in a fight with the Defendant's mother. The group carried some bags of clothing and two weapons. Ms. Callahan testified that the Defendant was carrying a 12-gauge shotgun, and the victim was carrying a 20-gauge shotgun. Ms. Callahan stated that her daughter and a friend had been shooting the .22 caliber rifle, which was stored in a closet bedroom, in the field behind her residence

earlier that day.

Ms. Callahan agreed that the group could stay overnight at her residence but said they had to unload the two guns in their possession. She testified that she had unloaded the .22 caliber rifle before putting it in the closet. Ms. Callahan recalled that the group complied and placed the ammunition on the kitchen counter and the guns in Ms. Callahan's bedroom. Along with Ms. Callahan and her daughter, the group socialized for a period of time before Ms. Callahan retired to bed around 1:00 a.m. Mr. Frost left the residence soon after, and the Defendant and the victim stayed awake talking. Ms. Callahan testified that no one else was around her residence or yard at that point because, if anyone had been present, her dogs would have "gone wild."

Ms. Callahan testified that she had not seen the Defendant using drugs that night but, based upon her observations of the Defendant, she believed he had been using drugs. Ms. Callahan described the Defendant as agitated and "antsy." Ms. Callahan woke up around 5:30 a.m. and went to her living room to smoke a cigarette; her children were still sleeping. Ms. Callahan found the Defendant and the victim talking in one of the bedrooms, and the victim was telling the Defendant to calm down and that no one was outside. The victim was not holding a weapon. The Defendant said, "I know those m***** f****** are out there and I'll prove it to you." Ms. Callahan's dogs remained quiet, and she maintained that, had anyone been outside, the dogs would have "gone ape s**t." Ms. Callahan then saw that the Defendant was holding the 12-gauge shotgun which caused her to be on alert. She told the Defendant to calm down and not to scare her children. The victim attempted to show the Defendant that no one was outside, shining a flashlight through the back door, while he looked through the front door. Suddenly, the Defendant grabbed the 12-gauge shotgun with both hands and aimed it at the victim before pulling the trigger, shooting the victim in the torso. Ms. Callahan called 911 immediately and then tried to stop her children, now awake, from seeing the victim's body. The Defendant got on the floor with the victim's body and put her in his lap, crying and asking her to "come back." Ms. Callahan locked herself in a bedroom with her children while waiting for the police to arrive.

Ms. Callahan testified that she later discovered three or four bullet holes in her daughter's bedroom wall from where the .22 caliber rifle had been shot. She reiterated that the weapon had not been loaded earlier that night.

Ben Gunter testified that he was a deputy for the Morgan County Sheriff's Office and responded to the scene of the shooting. Inside Ms. Callahan's residence, he found three weapons: the 12-gauge and 20-gauge shotguns and the .22 caliber rifle. All three weapons were in the living room when he arrived. Deputy Gunter cleared the weapons of ammunition immediately; he recalled that the 12-gauge shotgun and the .22 caliber

rifle were loaded but he could not remember if the 20-gauge shotgun was loaded.

Dr. Amy Hawes testified that she was Assistant Medical Examiner for Knox County and was qualified as an expert in forensic pathology. She performed an autopsy on the victim and determined the cause of her death to be a gunshot wound to the torso.

Brandon Frost testified that he was with the Defendant on the day of the shooting and saw the Defendant holding both the 12-gauge and 20-gauge shotguns. The Defendant showed both of them to Mr. Frost. Mr. Frost did not recall seeing the .22 caliber rifle. Mr. Frost recalled that he and the Defendant were using methamphetamine that day.

The State concluded its proof, and the Defendant testified that he had been engaged to the victim and that she was "everything" to him. He testified consistently with the other witnesses about how he came to be at Ms. Callahan's house. The Defendant admitted to being in possession of the 12-gauge shotgun but denied being in possession of any other weapons.

The Defendant stated that, at some point during the night while the group stayed at Ms. Callahan's, three men came to the residence to buy methamphetamine from him. One of the men pulled a gun in the Defendant's face, a .380 "Hi-Point." The men eventually left. The Defendant and the victim went into a back bedroom; the Defendant returned to the living room for a moment when he heard five shots from the .22 caliber rifle. He went into the bedroom where the victim was, and she told him "they" were outside and showed him the bullet holes in the wall. The Defendant had "no idea" where the rifle came from and had not seen it before that moment. The Defendant then took the victim into the living room, where they sat for over an hour waiting for daybreak. The Defendant was "antsy" because he knew "they" were outside. He and the victim went back into the bedroom when the front door "jerked" open, and the Defendant heard, "where is the f****** monkey and the dope?" The Defendant told the victim to stay in the bedroom while he went back into the living room and confronted the intruders with the loaded 12-gauge shotgun. The Defendant was able to get the intruders out of the front door. He recalled that hanging over the front and back doors of the residence were blankets to prevent cold air from seeping in.

After the Defendant got the intruders out the front door, he locked the door and told Ms. Callahan, who was hysterical, to calm down so he could hear if the intruders were still outside the residence. The Defendant was listening at the front door when he turned and saw a silhouette behind the blanket on the back door. He fired his weapon and the victim's body fell out from behind the blanket. The Defendant testified that he did not intend to shoot the victim. The Defendant testified that he was defending the

5

residence and its occupants, and he did not shoot the intruders when they came inside the residence because of the children present. The Defendant denied being high on drugs that day or being paranoid.

On cross-examination, the Defendant agreed that he had prior convictions for theft and robbery. He agreed that he had no place to live at the time of the crime and was using methamphetamine in that time period. He denied being antsy or agitated at Ms. Callahan's house. The Defendant did not know the names of the intruders. He explained that Ms. Callahan's dogs either were not present in the home or did not bark that evening. The Defendant said that the other witnesses' accounts, inconsistent with his own, were lies.

The Defendant agreed that he put the spent shells from the .22 caliber rifle in his pocket.

Damara Hunt testified that she was the Defendant's niece and was at the Defendant's mother's home on the night of this incident. She stated that she saw the Defendant with two weapons. Ms. Hunt was shown the 12-gauge shotgun, which she recognized, and the 20-gauge shotgun, which she said "look[ed] familiar."

Angie Davis, the Defendant's mother, testified that he was at her house on the night of this incident and that he had two guns with him. Ms. Davis asked the Defendant and the victim to leave her home because there were too many people inside. Ms. Davis identified the 12-gauge shotgun as one of the guns but did not recognize the 20-gauge. Ms. Davis "assumed" that the Defendant had a problem with methamphetamine use but stated that he was never "high" around her. Ms. Davis did not know if the Defendant had used drugs that day.

Following the close of proof, the Defendant pleaded guilty to one count of being a felon in possession of a weapon, the 12-gauge shotgun (Count 2). Based upon the evidence presented at trial, the jury convicted the Defendant of one count of second degree murder (Count 1), one count of being a felon in possession of a weapon, the 20-gauge shotgun (Count 3), one count of attempted possession of a weapon by a convicted felon, the .22 caliber rifle (Count 4), and two counts of reckless endangerment (Counts 5 and 6). For the second degree murder conviction, Count 1, the trial imposed a sentence of twenty years. For the felon in possession of a weapon convictions, Counts 2 and 3, the trial court imposed consecutive sentences of five years. These convictions were ordered to be served consecutively to the Defendant's convictions in unrelated cases. For the conviction of attempted possession of a weapon by a convicted felon, Count 4, the trial court imposed a consecutive sentence of three years. The trial court merged the two reckless endangerment convictions, Counts 5 and 6, and imposed a sentence of two years

to be served concurrently. The total effective sentence imposed was thirty-three years.

It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to support his conviction for second degree murder; (2) the State failed to disclose evidence it planned to introduce at trial; and (3) the trial court erred when it instructed the jury about the mental state required for a conviction for unlawful possession of a firearm by a convicted felon.

## A. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support his second degree murder conviction because his "high level" of methamphetamine intoxication prevented him from forming the mental state required for second degree murder. He contends that his intoxication prevented him from being "aware" of his actions and thus he did not kill the victim "knowingly." He further contends that he acted in self-defense, justifying the killing. The State responds that the evidence presented was that the Defendant was not intoxicated, by his own admission and by the accounts of other people with him that evening, and that the evidence was sufficient for the jury to conclude that the Defendant had the mental capacity required. The State further responds that the evidence was sufficient for a jury to conclude that the killing was not committed based on justifiable self-defense. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v.*

7

*Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).

Second degree murder is defined as "a knowing killing of another." T.C.A. § 39-13-210(a)(1) (2014). The requisite mental state, "knowing," requires proof that a defendant "is aware that the conduct is reasonably certain to cause" the death of another. T.C.A. § 39-11-203(b).

The evidence, considered in the light most favorable to the State, shows that the Defendant pointed a loaded 12-gauge shotgun at the victim and shot her in the torso, causing her death. The Defendant claims that he lacked the mental state required to find a "knowing" killing, due to his being intoxicated. No one saw the Defendant use drugs that evening, although several witnesses assumed he was "high." The Defendant told Investigator Wren that he had used drugs earlier that day. The Defendant, however, testified at trial that he was not "high" and had not used drugs that day. This evidence is sufficient from which a jury could have concluded beyond a reasonable doubt that the Defendant was not intoxicated and had the requisite mental state for second degree murder. Accordingly, we conclude that the evidence is sufficient to support the conviction.

As to the Defendant's contention that his claim of self-defense undermines the verdict, the jury heard from the Defendant and other witnesses that the Defendant felt threatened by intruders that he claimed had entered the house with a gun pointed at him before the shooting. The jury also heard Ms. Callahan testify that, if anyone had been present outside her home, her dogs would have alerted her. By its verdict, the jury discredited the Defendant's claim that he had a reasonable belief that he was in imminent danger of death. It is within the province of the jury to assess witness credibility and determine the weight and value to be given to the evidence. *Bland*, 958 S.W.2d at 659. As such, the Defendant is not entitled to relief on this issue.

## B. Withholding of Evidence

The Defendant contends that the State withheld certain items of evidence, items removed from his pockets, which were crucial to his defense. He claims that, because he was charged with possession of several types of firearms, the type and number of shotgun shells found was pivotal to his defense strategy. The State responds that the Defendant has waived this issue based on the lack of a specific objection and failure to provide a complete record. The Defendant replies that he objected to the introduction of this evidence specifically at trial and thus has not waived this issue.

Appellate relief is generally not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Failure to lodge a contemporaneous objection also risks waiver. *See* Tenn. R. App. P. 36(b). Furthermore, it is the Appellant's duty to ensure that the record on appeal contains all of the evidence relevant to those issues which are the bases of the appeal. *See* Tenn. R. App. P. 24(b); *State v. Banes*, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). This court is unable to consider an issue which is not preserved in the record for review. *See Banes*, 874 S.W.2d at 82.

We have reviewed a transcript of what occurred during the introduction of the evidence at issue, done in part during Deputy Hargis's testimony and in part during Investigator Wren's testimony. The evidence introduced was referred to as "contents of suspect's pockets" by the witnesses, and the Defendant objected to the items not being listed more specifically in the evidence log, namely a pocketknife and cigarettes. On appeal, he contends that the evidence log listed ".22 shells and shotgun shells" but failed to specify the caliber of shotgun shells or the number of shotgun and .22 caliber shells.

9

This failure, he contends, prejudiced him by hampering his ability to develop a defense strategy relevant to his alleged possession of all three weapons.

The evidence log is not included in the record. The Defendant specifically objected to the introduction of the pocketknife and cigarettes but did not mention in his objection the number of shells. It is unclear from the transcript exactly what items were being introduced by the State or complained of by the Defendant. Without the evidence log or a complete accounting of what was introduced at trial, this court cannot determine if there was a falsification or misleading item in the evidence log, or if the same impacted the Defendant's strategy at trial. Accordingly, the Defendant's failure to include a complete record constitutes a waiver to any challenge of the trial court's rulings. *See generally State v. Ballard*, 855 S.W.2d 557, 560 61 (Tenn. 1993) (appellant's failure to provide this court with a complete record relevant to the issues presented for review constitutes a waiver of the issue); *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990) (appellate court is precluded from considering an issue when the record does not contain a transcript of what transpired in trial court with respect to that issue). Additionally, our review of the transcript reveals that the Defendant did not specifically object to the shells being introduced on the basis which he now alleges. We conclude that the Defendant has waived this issue for failure to provide a complete record. Further, we note that Rule of Criminal Procedure 16 mandates that the State allow a defendant access to all tangible items of evidence. The evidence in this case was thus available for review prior to trial, and the Defendant could have viewed it and known exactly what evidence might be introduced at trial. The Defendant is not entitled to relief as to this issue.

### C. Jury Instruction

The Defendant contends that the trial court erred when it instructed the jury relative to Counts 3 and 4, unlawful possession of a weapon by a convicted felon. He contends that the trial court's instruction that the Defendant must have possessed the weapon "intentionally, knowingly, or recklessly" was erroneous. He concedes that he failed to lodge a proper objection to the instruction, but he contends he is entitled to plain error relief. The State responds that the Defendant is not entitled to plain error relief because he has failed to establish a breach of a clear and unequivocal rule of law because "all three mental states apply" to these offenses and that the trial court properly instructed the jury on the definition of "possession." We agree with the State.

Relief is not required when "a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). As such, the issue is waived, and it may only be considered for plain error. *See* Tenn. R. Crim. P. 52(a). Tennessee Rule of Appellate

Procedure 36(b) states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for new trial or assigned as error on appeal." Accordingly, this Court will grant "plain error" review pursuant to Rule 36(b) only where the following five criteria are met: (1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it "'probably changed the outcome of the trial.'" *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994)). If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Id.* at 283. The party claiming plain error has the burden of persuading the appellate court. *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008).

A trial court has a duty to provide "a complete charge of the law applicable to the facts of the case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)); *see also* Tenn. R. Crim. P. 30(d)(2). A charge "should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury." *State v. Hatcher*, 310 S.W.3d 788, 812 (Tenn. 2010) (citations omitted). Tennessee law, however, does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). In determining whether jury instructions are erroneous, this court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998).

At trial, the Defendant did not object to the trial court's instruction. The trial court charged the jury, relevant to Counts 3 and 4, with the pattern jury instruction for the offense of unlawful possession of a firearm by a convicted felon. T.C.A. § 39-17-1307(b)(1)(A). The trial court stated that the jury must find in part that the Defendant had acted "intentionally, knowingly, or recklessly." The trial court defined possession as "actual possession" or "constructive possession" of a weapon, consistent with the pattern instructions. The definition of "constructive possession" states that a person who, although not in actual possession, *knowingly* has both power and intention at any given time to exercise dominion and control over an object is in constructive

11

possession of it." T.P.I.—Crim. 35.06(a) (16th ed.2012) (emphasis added). The Defendant contends that the trial court erred when it included "recklessly" in this instruction because it allowed the State to rely on a lesser standard of proof, amounting to a breach of a clear and unequivocal rule of law.

Concerning Counts 3 and 4, the language of the statute is silent as to a required culpable mental state for the offenses. T.C.A. § 39-17-1307(b)(1)(A) ("A person commits an offense who unlawfully possesses a firearm, as defined in § 39-11-106, and . . . [h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon"). Tennessee Code Annotated section 39-11-301 provides, "If the definition of an offense within this title does not plainly dispense with a mental element, intent, knowledge or recklessness suffices to establish he culpable mental state." Consistently, this court has noted that in the case of a statute that does not contain a specific mental state, "intent, knowledge or recklessness suffices to establish the culpable mental state." *See State v. Maurice Gray*, No. W2017-01897-CCA-R3-CD, 2018 WL 4382093, at \*10 n.1 (Tenn. Crim. App., at Jackson, Sept. 14, 2018), *no perm. app. filed*. Accordingly, the trial court properly instructed the jury as to all three mental states when it laid out the elements of the statute. As to the Defendant's argument that the trial court erred when it included "recklessly" in the instruction, thus requiring a lesser mental state, we disagree. The trial court included "knowingly" in its definition of "constructive possession," and, as juries are presumed to follow a trial court's instruction, *State v. Knowles*, 470 S.W.3d 416, 426 (Tenn. 2015), we conclude that if the jury based its verdict on "constructive possession" rather than "actual possession," that verdict would necessarily include the jury's finding that the Defendant had acted knowingly. As no clear and unequivocal rule of law has been breached, the Defendant is not entitled to plain error relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____

ROBERT W. WEDEMEYER, JUDGE